# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

UNITED STATES OF AMERICA,    )
        )
v.            )        CR417-090
        )
MICHAEL BRIAN ANDERSON,    )
        )
    Defendant.        )

## REPORT AND RECOMMENDATION

Michael Brian Anderson, charged with perpetrating a fraud upon an agency of the United States, has filed a motion seeking to suppress evidence seized pursuant to five search and seizure warrants issued by this Court. Doc. 29. Anderson has endeavored to show that the warrant affidavit[1] contained "multiple material falsehoods and omissions," thus entitling him to an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). *Id.* at 2. He further contends that there was no probable cause to support the issuance of one of the October 2014 warrants, that all of the warrants were overbroad in their descriptions of

---

[1] The Court issued two search warrants and two seizure warrants in October 2014, each of which relied on the same 37-page affidavit. It issued another seizure warrant in December 2014, which relied on essentially the same affidavit but also included information gained during the execution of the October warrants. For purposes of simplicity, the Court will use the singular "affidavit" and will cite only to the affidavit attached as Exhibit A (doc. 29-1) to Anderson's initial brief.

the items to be seized, and that the December 2014 warrant was the tainted fruit of the earlier unconstitutional searches (and, alternatively, was unsupported by probable cause). *Id.* In separate motions, he challenges the indictment's timeliness, doc. 34, as well as its sufficiency. Doc. 35.

## I. Background

On October 29, 2014, Scott McCormack, a special agent of Homeland Security Investigations (a branch of the U.S. Department of Homeland Security) applied for warrants to search a residence and a business located in Chatham County, Georgia, and to seize two investment accounts at a brokerage firm in Savannah. The 37-page affidavit accompanying the warrant applications asserted that the property sought to be searched contained evidence that Anderson had made false statements to U.S. Customs and Border Protection ("Customs" or "CBP"), used the United States Mail to facilitate a scheme to defraud that federal agency of some $700,000, and engaged in money laundering transactions with the ill-gotten proceeds. Doc. 29-1 (Affidavit in support of search and seizure warrant applications) (hereinafter "Aff."). The affidavit further represented that the two investment

accounts contained proceeds traceable to those crimes. *Id.* After finding

probable cause, the Court issued all four warrants and, some two months

later, issued a fifth warrant authorizing the seizure of yet another

investment account.

The warrant affidavit alleged that Anderson, a local shrimper who

ran his small business ("Shrimpy's") out of his personal residence, had

fraudulently applied for some $24,184,352 under a government program

designed to compensate domestic producers of shrimp injured by the

unfair business practices of foreign competitors, who had "dumped"

frozen shrimp into the United States at below cost. The Continued

Dumping and Subsidy Offset Act of 2000 ("CDSOA"), also called the

Byrd Amendment, was a short-lived congressional act[2] that directed

---

[2] Under the trade laws of the United States, the Department of Commerce is empowered to determine whether certain imported goods are being "dumped" into this country -- *i.e.*, sold "at less than fair value." 19 U.S.C. § 1677(34). Where that determination is made, and it is further determined that such dumping has materially injured a U.S. industry, "Commerce issues an anti-dumping duty order" and Customs proceeds to collect those duties from the offending foreign countries. *SKF USA v. U.S. Customs & Boarder Protection*, 556 F.3d 1337, 1340-41 (Fed. Cir. 2009). In 2000, Congress directed that such anti-dumping duties "collected by Customs be distributed to 'affected domestic producers' for [their] 'qualified expenditures.'" *Id.* at 1341 (quoting the CDSOA); *see* 19 U.S.C. § 1675c(b) (defining "affected domestic producer" and "qualifying expenditure"). After finding that the domestic shrimp industry was one of the industries injured by unfair foreign trade practices, Commerce issued an anti-dumping order on frozen shrimp imports from certain specified countries on February 1, 2005. *Tampa Bay Fisheries, Inc. v. United States*, 609 F. App'x 637, 638-39 (Fed. Cir. 2015). Although Congress repealed the

Customs to distribute the anti-dumping duties collected from the offending foreign countries to those "affected domestic producers" who certified that they had incurred certain "qualifying expenditures." The list of domestic producers who had applied for, and been deemed potentially eligible to receive, a portion of the annual distribution of the assessed duties was published in the Federal Register.

Anderson, whose name appeared in the Federal Register, was one of many thousands of individuals or businesses who submitted a CDSOA claim by completing an official CBP Form 7401 that listed his qualifying expenditures. Each form, which Anderson signed and submitted by mail, contained this certification: "The information contained in this certification is true and accurate to the best of my knowledge and belief, under penalty of law, of the claimant and *the claimant has records to support the qualifying expenditures being claimed.*" Aff. at 7, ¶ 7 (emphasis added). Each form that Anderson submitted also listed 303

CDSOA in 2006 (effective October 1, 2007), the "repealing statute provided that any duties paid on goods that entered the United States prior to the date of repeal would continue to be distributed in accordance with the pre-repeal statutory scheme." *Pat Huval Rest. v. Int'l Trade Comm'n*, 785 F.3d 638, 640 (Fed. Cir. 2015). It is undisputed that affected domestic producers of shrimp could file an application to recover their qualifying expenditures incurred during the 32-month period from February 1, 2005 until October 1, 2007, and that they could file applications year after year until they received compensation for all their claimed expenditures, or until the duties collected by Customs had been exhausted. Aff. at 5.

Labre Road as the mailing address for his business, Shrimpy's. *Id.* at 6, ¶ 4. The investigating agents determined that this address was the residence of Anderson and his wife. *Id.*

The claim forms that Anderson submitted listed his expenditures for various standard-form items, including "Manufacturing Facilities," "Equipment," and "Acquisition of Raw Materials." Aff. at 7-14, ¶¶ 9, 11, 16, 19, 23, 27, 33, 35. While Anderson's initial claim in July 2005 reported expenditures in the amount of $218,881, *id.* at 8, ¶ 9, his asserted expenditures continued to rise over the years until in July 2010 he made a claim for $24,184,352. *Id.* at 12, ¶ 27. He submitted claims for the same $24 million amount in the three succeeding years. *Id.* at 13, ¶¶ 31, 33; 14, ¶ 35.

In July 2013, Customs requested that Anderson produce supporting documentation for his claimed expenditures. *Id.* at 14, ¶ 36. When Anderson supplied a "shoebox" containing various receipts, Customs notified him that these receipts were inadequate and requested additional documentation. *Id.* Anderson responded that he was unable to recover receipts for his operating expenses but could furnish receipts for his acquisition of raw materials that would account for $18 million of

his $24 million in expenditures. He then produced printed invoices reflecting his purchase of shrimp in 2005 and 2006 from R&R Seafood on Tybee Island, Georgia. Aff. at 14, ¶ 38. The invoices, each essentially identical except for the date of issue, reflect that Anderson repeatedly purchased 100,000 pounds of shrimp from R&R Seafood, paying between $6.10 to $6.30 per pound. *Id.* at 14-15, ¶ 38.

During the course of their investigation of Anderson, federal agents learned that R&R Seafood had operated its business on Tybee Island from approximately 1995 until the business closed a few months before Robbie Robertson's death in either December 2006 (as reported in ¶ 40 of the affidavit) or December 2005 (as reported in ¶ 42).[3] This small seafood business was operated by Robbie Robertson, who caught shrimp from local waters using his boat the ROHO, and his common law wife, Lisa Carter, who sold the shrimp that Robertson caught. Aff. at 15, ¶ 41. During her interview in November 2013, Carter told the investigators that R&R Seafood supplied shrimp to only two businesses, a restaurant and a grocery store located on Tybee Island, and that it sold the rest of its product to walk-in retail customers. Aff. at 16, ¶ 43. She further

---

[3] The Court will devote more attention to this date discrepancy, which Anderson cites as one basis for a *Franks* hearing, in the discussion below.

indicated that Robertson's daily shrimp haul did not exceed 300 to 500 pounds and that the most shrimp that she could recall selling in one day was around 100 pounds. *Id.* She stated that R&R Seafood never provided printed receipts to any of its customers, but instead handwrote receipts on a "carbon receipt book" to those customers who requested such documentation. *Id.* When shown a copy of one of the receipts which Anderson had provided to Customs, reflecting a purchase of 100,000 pounds of shrimp for $610,000, Carter stated that this was not a receipt ever issued by R&R Seafood and that the business had never sold that amount of shrimp to any customer on a single occasion. Aff. at 16, ¶ 44.

The agents also spoke with a statistician for the Georgia Department of Natural Resources (DNR) who maintained a database of all shrimp catches reported to DNR by Georgia commercial fishermen. Aff. at 16-17, ¶ 45. The DNR records reflected that Robertson landed 24,834 pounds of shrimp for the year 2005. *Id.* at 17, ¶ 46 (also noting that DNR had no catch totals for the ROHO for 2006 or 2007). Further, the statistician revealed that the entire Chatham County shrimping fleet reported only 1,058,844 pounds for 2005, 1,003,075 for 2006, and 657,646

pounds for 2007. *Id.* at 17, ¶ 47. Anderson, on the other hand, claimed to have purchased 2,200,000 pounds of shrimp in 2005 and 1,700,000 pounds in 2006. Aff. at 17-18, ¶ 48.

Based on their examination of certain bank records (more about that later), the agents determined that some of the CDSOA duties distributed to Anderson were deposited into his SunTrust bank accounts and then transferred to two investment accounts at Edward Jones in 2013. Aff. at 18-19, ¶¶ 50, 52; *id.* at 20, ¶ 56 (noting that Anderson deposited "at least $457,679.04 of CBP funds into his accounts and co-mingled his personal and business transactions.").

## II.   *Franks* Issue

An affidavit presented in support of a search warrant carries "a presumption of validity," *Franks*, 438 U.S. at 171, and any defendant who seeks to offer evidence impeaching the affidavit's factual assertions must meet an "onerous" burden. *United States v. Daoud*, 755 F.3d 479, 488 (7th Cir. 2014); *United States v. Clenney*, 631 F.3d 658, 663 (4th Cir. 2011) (*Franks* imposes a "rigorous" standard). Under *Franks*, the defendant is required to make "a substantial preliminary showing that a false statement knowingly or intentionally, or with reckless disregard for

the truth, was included by the affiant in the warrant affidavit" *and* demonstrate that the allegedly false statement is necessary to the finding of probable cause. *Franks*, 438 U.S. at 155-56. Mere "conclusory" allegations of deliberate falsehood or recklessness will not suffice. *Id.* at 171. Rather, the defendant must make "an offer of proof," supported by affidavits or other reliable witness statements, establishing the deliberate falsity or recklessness[4] of the affiant's own statements (not those of some witness or informant who misled the agent), or satisfactorily explain the absence of such evidence. *Id.* at 171. Because the *Franks* "substantiality requirement is not lightly met," *United States v. Arbolaez*, 450 F.3d 1283, 1294 (11th Cir. 2006), defendants contesting

---

[4]  A false statement in an affidavit that springs from mere "negligence or innocent mistake" does not entitle a defendant to any relief -- the falsehood must be included either deliberately or recklessly by the affiant. 438 U.S. at 171. *Franks*, however, did not elaborate on what form of recklessness it had in mind -- the subjective recklessness used in the criminal law, which requires that a person disregard a risk of harm of which he is *aware*, or the objective recklessness used in the civil law, which permits liability to be founded upon the disregard of a risk that is "so obvious that it should be known." *Farmer v. Brennan*, 511 U.S. 825, 836-37 (1994) (holding that the "deliberate indifference" state-of-mind requirement for establishing a prison official's civil liability for an Eighth Amendment violation should be defined in terms of the subjective recklessness standard of the criminal law, not the objective civil-law recklessness standard); *id.* at 839 (noting that its precedents had adopted the same subjective standard in assessing "reckless disregard" for the truth in a defamation action by a public figure). While the Eleventh Circuit has yet to "stake[ ] out a bright line" for recklessness in the *Franks* context, other appellate courts have interpreted the *Franks* "reckless disregard" language as requiring "a high degree of awareness of [the statement's] probable falsity." *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000) (also "borrow[ing] from the free speech arena").

the truthfulness of a warrant affidavit receive a hearing only "infrequently." *Daoud*, 755 F.3d at 488.

### A. The Alleged Falsehoods

Anderson points to four "demonstrably false statements and omissions"[5] in the warrant affidavit that were made either deliberately or with reckless disregard for the truth. Doc. 29 at 9. Each of the alleged falsehoods, he contends, was essential to the finding of probable cause. *Id*. The Court must determine whether these claims are sufficiently "substantial" to warrant an evidentiary hearing. *Franks*, 438 U.S. at 151.

> 1. The statement that Anderson sought payment of his "expenditures for foreign shrimp"

Under the CDSOA, only "affected domestic producers" of a designated product (here, shrimp) were entitled to file an application seeking to share in the anti-dumping duties collected and distributed by Customs. Anderson claims that despite his status as such a qualifying domestic producer, doc. 29 at 10, the affidavit falsely portrayed him as

---

[5] Although *Franks* addressed only an alleged "false statement" in a warrant affidavit, the reasoning of that case covers material omissions as well, *i.e.*, omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate. *United States v. Martin*, 615 F.2d 318, 328 (5th Cir. 1980); *United States v. Brown*, 2008 WL 5099922 (S.D. Ga. Nov. 25, 2008); 2 Wayne R. LaFave, Search and Seizure § 4.4(b) at 690 (5th ed. 2012).

seeking to recover his "expenditures *for* foreign imported shrimp into the United States." Aff. at 7, ¶ 6 (emphasis added). This statement, Anderson reasons, was designed to give the false impression that he was *not* an "affected domestic producer" of shrimp and therefore had no right to claim any share of the anti-dumping duties collected by Customs.

No fair interpretation of the warrant affidavit as a whole would lead any careful reader of that document to such a conclusion. Other than this one sentence -- which, despite the government's quibbling, *is clearly* inaccurate[6] -- nothing else in the affidavit even remotely suggests that Anderson was not a domestic producer of shrimp, or that he bought and sold foreign shrimp. The affidavit, in fact, is quite to the contrary. The first sentence of the affidavit's "Probable Cause" section describes

---

[6] In addition to noting that Anderson has read the sentence out of context (which is true), the Government suggests that the agent's statement was not "false" at all but was just "a condensed way of saying that Defendant was seeking expenditures *from* foreign countries *for* the dumping of shrimp in the United States market." Doc. 39 at 4 (emphasis added); *see id.* at 5 (suggesting that "[e]very domestic producer of shrimp" who sought CDSOA funds was "claim[ing] expenditures for *foreign imported shrimp into the United States*"). But the Government has simply rewritten the sentence to give it the interpretation it prefers, rather than giving the sentence its natural, ordinary meaning. Only a tortured reading of what the agent actually said -- that Anderson was seeking to recover his expenditures *for* foreign shrimp -- would support the Government's construction. Most readers, and (the Court would venture) most grammarians schooled up in syntax and morphology, would conclude that Anderson's expenditures "for" foreign shrimp were just that -- his acquisition costs in obtaining foreign shrimp. Since it is undisputed that Anderson incurred no such costs, the statement is false.

Anderson as a "shrimper" who owned "Shrimpy's, a small shrimp supplier in Savannah, Georgia." Aff. at 5, ¶ 1. Two paragraphs later the affidavit informs the reader that "Shrimpy's is in the business of catching and selling shrimp." *Id.* at 6, ¶ 3. When agents conducted surveillance at Anderson's business address (which turned out to be his residence), *id.* at ¶ 4, they observed "several boats" and a walk-in freezer, the very trappings of a shrimper. Aff. Attachment A-1, ¶ 1. So, rather than describing Anderson as some sort of broker who purchased foreign shrimp for resale in the Savannah market, the affidavit gave the reader the clear impression that Anderson was a small-time local shrimper who earned his living by selling shrimp that he caught and stored himself, using his own equipment. Certainly, there is no hint in the affidavit that Anderson had any foreign supply sources or that he ever acquired any shrimp from importers who brought them to this country.

Except for the one prepositional phrase that Anderson has highlighted, the affidavit gives the clear impression that Anderson was a domestic producer of shrimp. It is true, as Anderson points out, that the affidavit never states affirmatively that he was an "affected domestic producer" within the meaning of the CDSOA. Doc. 45 (reply to

Government's response) at 3.[7]   But given the strong showing that Anderson had falsified invoices to support his claim of $24 million in expenditures in a two-year period (a considerable sum indeed for a small local shrimper), as well as the absence of any other evidence from Anderson as to exactly what his true expenditures were, it is by no means remarkable that the Government investigators withheld judgment about Anderson's status as an "affected" domestic producer with true "qualifying" expenditures until he produced legitimate evidence of such.

The structure of the affidavit as a whole belies the argument that the agent was trying to persuade the Court that Anderson traded only in foreign shrimp and, therefore, was not a domestic producer of shrimp to any degree.   Rather, the affidavit, read fairly, suggests that Anderson was greatly exaggerating the *scope* of his domestic shrimp production (and his attendant expenses for that production), not falsely claiming to be a local shrimper when he was no such thing.   So, while Anderson has found an inaccurate (false) statement in the affidavit, he has not met his significant threshold burden of establishing that this statement was

_____

[7]  Neither, however, does the affidavit state that he *wasn't* such an "affected domestic producer."

deliberately false, or made with reckless disregard for the truth.[8]
Anderson gets no *Franks* hearing on this claim, therefore.

### 2. The statement that Robbie Robertson died in 2005

Anderson asserts that the affidavit is fatally flawed because it erroneously "informs the Court several times that [Robbie] Robertson died in 2005 and that R&R [Seafood] closed around the same time," thus leaving the Court to infer that the R&R invoices Anderson submitted to Customs reflecting a 2006 date of issuance were clearly "a sham" (for presumably dead men and closed businesses do not issue invoices). Contrary to Anderson's brief, the affidavit does not "inform" the Court either that Robertson died in 2005 or that his business closed that year. Rather, the affidavit reports what Aletha Carter, Robertson's business partner and common law wife, "said" to the agents during her November

---

[8] Again, the conclusional statement that Anderson was seeking compensation "for" foreign shrimp doesn't match up with the objective facts that the Court relied upon in finding probable cause. The Court is persuaded that the highlighted sentence is the result of poor draftsmanship, not some effort to deceive or recklessness on the part of the agent. There is other evidence -- offered by Anderson in his suppression motion materials -- that further confirms this assessment. In one of his investigative reports (doc. 29-5), Agent McCormick states that for the years 2005 and 2006 Anderson claimed some $24 million "in expenditures *for* five (5) countries that had imported shrimp into the United States." *Id*. at 4 (emphasis added). This statement, which is simply nonsensical, reflects the same linguistic imprecision as later appears in the agent's affidavit: CDSOA applicants did not seek to recover their costs "for" *foreign countries* but, rather, their costs occasioned by the unfair trade practices (dumping of shrimp) engaged in by certain foreign countries. Evidently, Agent McCormick has trouble with the clarity of his prepositional phrases.

2013 interview about the date of Robertson's death and the business closure. Anderson has made no claim, much less an offer of proof, that Ms. Carter did not make such statements.

Moreover, in the paragraph immediately preceding those cited by Anderson, the affidavit states that, according to R&R Seafood's landlord, the business closed in July 2006 due to Robertson's illness and that he passed away in "December 2006." Aff. at 15. Thus, the witnesses gave conflicting accounts of when Robertson died and the business closed. The affidavit makes no attempt to resolve that conflict and therefore does not, as Anderson suggests, give the reader the false impression that Robertson died before the dates listed on the 2006 (phony) invoices.[9]

The preponderant theme of the affidavit is that *all* of the invoices which Anderson presented to Customs were fake (because R&R Seafood never generated such invoices in the first place and never dealt in the volume of shrimp claimed on those invoices), not that *some* of the invoices were "a sham" because they were issued after the 2005 date of death mentioned by Ms. Carter during her interview. Anderson has

_____

[9] It is undisputed that Robertson in fact died in December 2006, not December 2005. *See* doc. 29-6 (Ex. F) at 2 (investigative report of a Coast Guard agent, who had been informed by a hospital that Robertson had "expired on 11 December 2006"). The record, however, does not establish the exact date that R&R Seafood shut down its operation in 2006.

manufactured a falsehood where there is none. Certainly, he has not made a "substantial" showing that in leaving the witness conflict about the date of Robertson's death and business closure unresolved, the agents set out to deceive the Court or engaged in a reckless disregard for the truth.

### 3. The reference to records regarding the Georgia shrimp harvest

The affidavit cites to official records from the Georgia Department of Natural Resources demonstrating that Anderson claimed to have purchased more shrimp from R&R Seafood during 2005 and 2006 than was hauled in by the entire shrimping fleet of Chatham County, Georgia during those years. Anderson does not dispute the accuracy of the DNR records. Instead, he points out that the affidavit neglects to mention that "Anderson's claims accounted for less than 1% of the total amount claimed" by *all those* who submitted claims to Customs under the CDSOA. Doc. 29 at 13.

The Court is mystified as to the relevancy of this missing information, or how its inclusion would have undercut the potency of the Government's evidence. That Anderson's claims were only 1% (or any other percentage) of the total CDSOA claims doesn't explain how he

could buy more shrimp from R&R Seafood than all of the shrimpers in Chatham County were able to haul from the sea. Anderson offers no evidence that, as a local shrimp supplier, he was buying shrimp from South Carolina, or Florida, or from anywhere outside the local community. Furthermore, the fact that Anderson, a small operator, who ran his business from his residence, was claiming as much as 1% of the total amount claimed by all CDSOA applicants seems to bolster, not detract from, the strength of the Government's evidentiary showing. This claim is far too insubstantial to warrant a *Franks* hearing.

> 4. The statement that Anderson's bank records did not support his claimed expenditures of $24 million

Every year from July 2005 until July 2014, Anderson submitted claim forms to Customs (on CBP Form 7401) seeking a CDSOA distribution for his listed expenditures during 2005 and 2006.[10] Aff. at 7, ¶¶ 7, 8; *id.* at 8-14 (listing the various claims and their amounts). Customs targeted Anderson for investigation after he began to claim expenditures in the amount of $24,184,352 during the four year period beginning July 2010. Aff. at 12-14. When Customs sought

---

[10] Again, while the CDSOA only permitted domestic shrimp producers to claim compensation for their qualifying expenditures incurred from February 1, 2005 until October 1, 2007, claimants could file applications year after year (when CDSOA funds were available) until they had been compensated for all their claimed expenditures.

documentation to support these claimed expenditures, Anderson eventually produced a series of invoices, all purportedly from R&R Seafood, dated from February 14, 2005 until September 29, 2006.

As noted, the investigators determined that the R&R Seafood invoices presented by Anderson were phony, that he claimed to have purchased far more shrimp from R&R Seafood than that one-boat shrimp business ever caught, and that his claimed purchases from R&R during 2005 and 2006 greatly exceeded the catch totals for the entire Chatham County shrimping fleet for those years. In addition to this compelling evidence of Anderson's fraud, the affidavit summarized the results of a financial investigation conducted by the agents upon a review of Anderson's personal and business bank records, which had been acquired through grand jury subpoenas. Aff. at 18-21. The affidavit stated that neither his personal nor his business accounts reflected that he had "expenses anywhere near the $24,184,352 he claimed on the CBP Forms 4701." Aff. at 18-19, ¶¶ 51, 52. Anderson contends that the quoted language is false, for it is undisputed that the bank records examined by the agents did not cover "the applicable time period" (*i.e.*, his expenditures during 2005 and 2006) but only reflected his bank account

activity from 2007 to 2014.  Doc. 29 at 13.

The affidavit itself does not contain any detailed recitation of the information gleaned by the agents during their review of Anderson's SunTrust bank records.  Aff. at 18-19.  The affidavit, however, does reference certain specific CBP checks, and their amounts, that were deposited into Anderson's SunTrust accounts.  *Id.* at 18-19, ¶¶ 51-52. A careful review of the affidavit shows that checks in those amounts were issued and mailed to Anderson on various dates in 2009, 2010, 2011, and 2012.  *Id.* at 10, ¶ 20; *id.* at 10-11, ¶ 21; *id.* at 11, ¶ 24; *id.* at 12, ¶ 29; *id.* at 13, ¶ 32.[11]  Thus, the affidavit does reveal Anderson checking account activity only for a limited number of years, all *after* 2005 and 2006.

Nevertheless, what the affidavit does not reveal is that SunTrust never produced any records for 2005 and 2006 because, by the time the investigators sought the SunTrust records in March 2014, the bank no longer had records for those years.  Doc. 29-9 (Exhibit I) at 3 (reflecting the date of the first grand jury subpoena (which sought only bank

---

[11]  Other CBP checks mailed to Anderson apparently were not deposited into his SunTrust accounts.  *See*, *e.g.,* Aff. at 13, ¶ 34 (reflecting a $ 372,300.82 check issued to Anderson on November 20, 2012 that is not listed as a deposit into either of his SunTrust accounts).

statements) and the transactions highlighted for further scrutiny, which began "6/15/09" and continued to "3/24/13" for one account, *id.* at 3-9, and began "10/22/07" and went through "4/10/13" for another account, *id.* at 9-10); doc. 29-10 (Exhibit J) at 3 (noting that "SunTrust only has records back to 2008."). Thus, while the Government is correct that the affidavit "never [affirmatively] misrepresented the time-period for which bank records were available," doc. 39 at 9, the affidavit failed to inform the Court that the agents had not, and could not, review SunTrust records from 2005 and 2006 because the records simply did not exist.

Anderson claims that Agent McCormick "knew" this information at the time he prepared his warrant affidavit. Doc. 29 at 14, 15. Anderson provides no persuasive evidence of this knowledge, however. The investigative report that reveals the non-existence of SunTrust records prior to 2008 was not prepared by Agent McCormick until May 7, 2015, over six months after McCormick applied for the warrants. It is true, and Anderson places great emphasis on this, that the records SunTrust produced pursuant to the initial grand jury subpoenas in 2014 reflected transactions no earlier than October 2007 (or at least the agents did not "highlight" any earlier records "for further scrutiny"). Still, Anderson

has not made a *substantial* showing that McCormick knew at the time that he prepared his affidavit that no SunTrust records existed for 2005 and 2006.

The affidavit nonetheless contains a significant omission. McCormick's statement that "Anderson had no expenses anywhere near the $24,184,352 he claimed on CBP Forms 4701," Aff. at 18-19, ¶¶ 51-52, fails to inform the Court that the agents had not reviewed bank records for the years 2005 and 2006 (even assuming that SunTrust would later be able to produce those records). While Anderson is simply wrong in arguing that bank records from 2007 to 2013 were not "relevant,"[12] doc. 45 at 11, he certainly makes a good point in arguing that the affidavit should have clarified that the agents had not acquired any bank record evidence reflecting his expenditures during the years covered by

---

[12]  In fact, the bank records for those years were highly relevant, for they showed Anderson was continually depositing CBP funds into his accounts during that time and transferring some of his co-mingled funds to other brokerage accounts. Moreover, those records establish that Anderson was not a big-time shrimp producer, with millions upon millions of dollars worth of expenditures, during the seven year period from 2008 to 2014. Doc. 29-10 (Exhibit J) (investigative report dated 5/7/15, noting that "[a] review of records from 2008 showed no such expenditures and "no checks written for the purchase of shrimp"). Clearly, records from the seven-year period after 2006 showing that Anderson was a small-time operator do not prove conclusively that he was also a small-timer during 2005 and 2006. But to suggest that bank records from later years have no probative value at all regarding the scope of Anderson's shrimp business in 2005 and 2006 is a frivolous argument, particularly given the other evidence that Anderson vastly inflated his business expenditures during those years.

the (purported) R&R Seafood invoices.

The affidavit should have informed the Court that its contention that "Anderson had no expenses anywhere near" the claimed $24 million (Aff. ¶¶ 51, 52) were based on review of bank records from 2008 forward, and *not* from any review of records from 2005 and 2006. But it is quite one thing to say that the affidavit was deficient in failing to include this information and quite another to say that the information's omission was designed to mislead, or made in reckless disregard of whether it would mislead, the Court. In the Court's judgment, Anderson has not made a "substantial" showing that the agent deliberately or recklessly concealed this information. Anderson's proof -- the agent's own investigative reports -- establishes at most the type of negligence that will not suffice under *Franks*. The core evidence in the affidavit -- the evidence that cinches probable cause for entering his home/business -- is this: that when asked to support his claim that he had $24 million in expenditures he presented a batch of phony invoices from a defunct business that never caught in the first place, or sold to Anderson, the quantity of shrimp reflected on those invoices. The agents' "financial investigation" also serves a key probable-cause purpose, for through the

examination of those bank records the agents were able to trace the funds that Customs had paid out to a person that they had determined to be a fraudster. Thus, the agents showed good grounds not only to search Anderson's home/business but also to seize his brokerage accounts. The evidence of Anderson's fraud was so powerful as to leave Agent McCormick little incentive to willfully misstate the evidentiary value of his bank records.

At bottom, the Court is left with the impression that Agent McCormick was not a master of detail, that he was inattentive, and that he was a poor writer. But the Court is not impressed with Anderson's showing that McCormick either set out to deceive, or entertained serious doubts as to the truth of his allegations, when he drafted his affidavit.

### B. Materiality

*Franks* requires, in addition to a convincing showing of deceit or recklessness on the part of the affiant, that the defendant demonstrate the materiality of any alleged falsehood. Only if the misstatement (or omitted information) is "necessary to the finding of probable cause" will the warrant be voided and the fruits of the search or seizure be suppressed. *Franks*, 438 U.S. at 156. If, when the affidavit's allegedly

false material is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, the Court need not conduct a hearing to afford the defendant an opportunity to prove his allegations by a preponderance of the evidence. *Id.* at 156, 171-72.

As largely foretold by the above discussion regarding the insubstantiality of Anderson's showing of deliberate or reckless falsehood, the warrant affidavit in this case, even upon the elimination (or correction) of all of its offending passages, retains sufficient content to establish probable cause

Anderson does not challenge the affiant's veracity in making the following statements: (1) that Anderson was a local shrimper who sought a proportionate share of certain duties collected by Customs under the CDSOA based on his claimed expenditures for 2005 and 2006; (2) that he ran his business from his house; (3) that he claimed to have expended some $24 million during a two-year period to operate his "small" shrimp business (including $18 million in "raw materials" (shrimp) alone); (4) that on his claim forms he swore to Customs under penalty of perjury that he had records to support those claimed expenditures; (5) that when he was asked to produce those records he furnished printed receipts from

R&R Seafood, a long-defunct business, showing his continual purchase of 100,000 pound quantities of shrimp from R&R Seafood in 2005 and 2006; (6) that when investigators interviewed the one surviving partner of that business they were informed that R&R Seafood had never utilized printed receipts (but only handwritten ones), that it never sold shrimp in 100,000 pound quantities but only in 100 pound amounts, that the then-deceased shrimper who caught the shrimp sold by the business never caught more than 300 to 500 pounds per day; (7) that R&R Seafood had not issued the receipts that had been furnished to Customs by Anderson; (8) that Anderson's bank records showed that he had deposited CDSOA checks into his personal and business bank accounts, where he co-mingled his business and personal expenses; (9) that Anderson had transferred funds from those bank accounts to three brokerage accounts; and (10) that Anderson's bank records during the period from 2007 to 2014 did not reveal "anywhere near" the $24 million he claimed on the forms he submitted to Customs.  Beyond any doubt the cumulative weight of this unchallenged material was sufficient to support the issuance of a search warrant for Anderson's business/residence, as well as seizure warrants for his brokerage accounts.  Because neither the

elimination of the alleged falsehoods, nor the inclusion of the information that Anderson contends was deliberately or recklessly omitted, would defeat probable cause, the Court can say with confidence that Anderson's veracity challenge is insufficient on its face, without any need for holding an evidentiary hearing.

### III. The Warrant Issued to Search Scuba Steve's Seafood

Agent McCormick's affidavit was submitted in support of four warrants, one of which sought to search the business known as Scuba Steve's Seafood, located at 7878 US Hwy 80, Savannah, Ga. Anderson contends that the affidavit failed to "establish a connection between Anderson and 7878 US Highway 80 or a link between that address and any criminal activity." Doc. 29 at 17. Indeed, as characterized by Anderson, the entire factual recitation relating to Scuba Steve's Seafood (Aff. at ¶ 5) contains merely "[t]hree bags of shrimp in the back of a pick-up truck and three checks from Shrimpy's to [Scuba Steve's Seafood owner] Steve Anderson" to connect defendant to the business. Doc. 29 at 20. Despite these unambiguous denials of any connection to the business, Anderson seeks to suppress any evidence turned up in the search of Scuba Steve's Seafood, implicitly asserting a privacy interest in

it sufficient to invoke the Fourth Amendment.

Defendant, however, has not contested the affidavit's representation that that business was operated by Steve Anderson, who incorporated "his company" in 2011 and serves as its "Chief Executive Officer." Aff. at ¶ 5. Defendant also does not contend that he worked at the location or kept any personal property there. Nor does he contest that his sole connection to the business was his ownership of the real estate where that business operated. *See* docs. 29 & 55.[13]

---

[13] Despite the Court's invitation to supplement his initial briefing to demonstrate that he had any sort of "possessory or other interest in that business, kept any of his personal property there, or had any legitimate expectation of privacy in the business premises" (doc. 54 at 2), Anderson devoted the majority of his supplemental brief to the argument that the Government had waived its chance to dispute that he had any privacy interest in Scuba Steve's Seafood. Doc. 55. That contention is without merit; the Court may raise the question of Fourth Amendment standing and decide the motion on that basis at any time so long as a defendant is given the opportunity to establish a factual record supporting his contention that he has a privacy interest worthy of Fourth Amendment protection. *See, e.g., United States v. McCalebb-Pippens*, 2010 WL 2927412 (E.D. Tenn. May 24, 2010) (even where unaddressed by either party, the court "must address the issue of standing *sua sponte*" because "the central inquiry in any suppression hearing is whether the defendant challenging the admission of evidence has shown a legitimate expectation of privacy in the place searched or the thing seized.") (quotes and cites omitted); *United States v. Renzi*, 2010 WL 1962668 at *1 (D. Az. Apr. 16, 2010) ("federal courts are required *sua sponte* to examine jurisdictional issues such as standing."). Indeed, that question can be raised by the court *on appeal*. *See Combs v. United States*, 408 U.S. 224, 227 (1972) (while standing can be questioned *sua sponte* by the Court of Appeals, an evidentiary record must be established before it can rule on the matter); *see also United States v. Jackson*, 618 F. App'x 472, 475 (11th Cir. 2015) ("if the district court addresses the merits of a defendant's Fourth Amendment claim without receiving evidence relating to his standing to bring such a claim, a reviewing court may be required to remand the case for fact-finding on the standing issue."). Defendant's citation to cases holding the Government had waived any challenge to defendants'

Further, Anderson does not contend that his status as landlord gave him any sort of expectation of privacy or right of possession sufficient to enable him to challenge the search of 7878 US Highway 80. *See* doc. 56-1 at ¶ 11 (formal lease agreement between defendant and his wife, as lessors, and Steve Anderson, the CEO and owner of Scuba Steve's Seafood, as lessee, reflecting a limited owners' right-of-access "for inspection, repairs and maintenance during reasonable hours" and in "case of emergency."). And ownership of premises used by another for business purposes, on its own, does not automatically confer Fourth Amendment standing. *United States v. Bunch*, 2012 WL 11799873 at *10 (N.D. Ga. Dec. 20, 2012) ("a landlord does not ordinarily have a legitimate expectation of privacy in his tenant's property sufficient to allow the landlord to challenge a search of his tenant's premises."); *id.* (collecting cases); *United States v. Deweese*, 632 F.2d 1267, 1270 (5th Cir. 1980) (noting "one may have fee simple title to property upon which he has no expectation of privacy.") (citing *Lewis v. United States*, 385 U.S. 206 (1966)). Put another way, Anderson has not mustered any

---

standing is inapposite; none of those cases held that this Court could not raise the issue *sua sponte*. *See* doc. 55 (citing *United States v. Lightbourn*, 357 F. App'x 259 (11th Cir. 2009); *United States v. Pearce*, 2016 WL 3945447 (S.D. Ala. July 19, 2016); and *United States v. Suarez-Blanca*, 2008 WL 4200156 (N.D. Ga. Apr. 21, 2008)).

evidence to show he had a subjective, much less a legitimate, expectation of privacy sufficient to challenge the search of 7878 US Highway 80.[14] *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978) (noting that it is well settled that "Fourth Amendment rights are personal rights . . . which may not be vicariously asserted" and it is defendant's burden to establish standing under the Fourth Amendment).

## IV.   The Breadth and Scope of the Warrants

---

[14]   Anderson briefly contends that the very desire to search 7878 US Highway 80 for any documents supporting Custom's suspicions is enough to prove he had a legitimate expectation of privacy in the property.  Doc. 55 at 2-3 (citing the Government's "representations [ ] made in the search warrant application, before the grand jury, and in its response to Anderson's motion to suppress.").  But neither the agents' belief that evidence of Anderson' fraud might be turned up at the property nor the Government's arguments in its briefing confer on Anderson any legitimate expectation of privacy.  Indeed, Anderson's exclusive reliance on the facts adduced by the Government, without any affidavit or testimony of his own setting forth evidence of his privacy interest in the property, is enough to conclude that he has not -- and cannot -- meet his burden of proof under the Fourth Amendment.  *See United States v. Ruth*, 65 F.3d 599, 605 (7th Cir. 1995) ("without an affidavit or testimony from the defendant it is almost impossible to find a privacy interest because this interest depends, in part, on the defendant's subjective intent and his actions that manifest that intent.").

Even then, as explained by Anderson in his own motion, the facts set forth in the affidavit (that "Scuba Steve's came into existence years after the period covered by the Byrd Amendment; agents reported seeing only a red pick-up truck leave Anderson's home and 'proceed to Scuba Steve's with shrimp in back; and Anderson wrote two checks personally to [Steve Anderson] in 2010 and 2011") do not provide a "link" between Anderson and the property (doc. 29 at 20), much less establish that he had a legitimate expectation of privacy in the property.  Defendant has failed to meet his burden of demonstrating a personal, reasonable expectation of privacy in 7878 US Highway 80.  *Rakas*, 439 U.S. at 143-44 (defendant bears the burden of proving that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable).

Anderson contends the search warrants for his home (303 Larbre Road) and his rental property (7878 US Highway 80) were overly broad in violation of the Fourth Amendment. The warrants sought documents and records regarding the subject of Custom's investigation: namely, "evidence . . . of false statements . . . mail fraud . . . and money laundering transactions over $ 10,000 . . . between 2005 through 2014." Doc. 29-1 (Search Warrant) at Attachment B. The warrant authorized agents to seize documents and recordings regarding: the catch, purchase, and sale of shrimp; the acquisition and use of manufacturing facilities, equipment, technology, raw materials, and working capital/funds used in the shrimping business; operational books and employment records for either Shrimpy's or Scuba Steve's and any documents showing the relationship between the two businesses; any CDSOA application records and receipts; bank statements and other financial records; safes or other secure storage devices; computers and printers capable of printing the phony R&R Seafood invoices; and proof of ownership of the premises. *Id.* These categories, defendant reasons, cover too "unclear" a time period (is it 2005 through 2014 or any time at all?) and too broad of materials.

The items identified for seizure, however, are sufficiently specific to

meet the Fourth Amendment's particularity requirement, which prevents "'general, exploratory rummaging in a person's belongings.'" *United States v. Wuagneux*, 683 F.2d 1343, 1348 (11th Cir. 1982) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)). They are both limited to the relevant time frame -- from 2005, when Anderson's CDSOA claims, if any, would have started accruing, through 2014, when he submitted his final CDSOA claim -- and appropriately tailored to the classes of items common to the fraudulent scheme under investigation. *See id.* at 1348-49 (because the "effective investigation of complex white-collar crimes may require the assembly of a 'paper puzzle' from a large number of seemingly innocuous pieces of individual evidence," "the particularity requirement must be applied with a practical margin of flexibility, depending on the type of property to be seized, and that a description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit."). The categories identified for seizure in Attachment B unquestionably specify categories of documents crucial to Custom's investigation of Anderson's phony CDSOA claims.

Law enforcement officers executing the warrant were not unguided

and free to rummage through all of defendant's residence or Scuba Steve's Seafood's business premises.[15]  Instead, the warrant narrowed the agents' search to items related to the alleged crimes -- false statements, mail fraud, and money laundering transactions from 2005 through 2014.  Thus, this argument also fails.

## V.    The December 2014 Warrant

Defendant also contends that the December 2014 warrant (issued in reliance on an affidavit sharing 55 of 56 paragraphs with the October 2014 affidavit) is invalid and the resultant seizure of certain account funds improper.  Doc. 29 at 24-25.  Because the October 2014 affidavit was valid, however, his contention that the December 2014 affidavit is *per se* invalid is moot.  His contention that, in the alternative, the December 2014 affidavit lacked probable cause to seize funds from his "Colony Bank" account and thus those funds should be ordered returned to Anderson is confusingly ill-conceived.

As an initial matter, defendant appears to misapprehend his own financial transactions.  Though he describes it as a "seizure" of a Colony

---

[15]    To the extent that any documents sought at Scuba Steve's Seafood, located at 7878 US Highway 80, may have fallen outside that investigation, as discussed above, Anderson is precluded from asserting that argument on its behalf.

Bank account (doc. 29 at 24), defendant does not dispute the Government's characterization of how the money (involving proceeds from his scheme to defraud a government agency) was deposited into his SunTrust accounts, transferred to Edward Jones Investment accounts, then on to a Wells Fargo Bank "financial advisers" account to be used as collateral to secure a loan extended by Colony Bank. Doc. 39 at 23-24. The warrant was directed at the Wells Fargo account used as collateral, not to the Colony Bank loan. The Wells Fargo account, containing assets derived from transferred property that may include funds fraudulently gained from the government, was subject to seizure and forfeiture as "constituting or derived from proceeds traceable to" defendant's alleged crimes. 18 U.S.C. § 981(a)(1)(C). So, defendant's arguments that the affidavit failed to establish the connection from those funds to the *Colony Bank* loan is inapposite to whether it set forth probable cause to seize the Wells Fargo collateral account.

Even then, Anderson does not dispute that the account at issue has been "frozen," not divested and taken into the Government's possession. Thus, it is unclear what relief he seeks, since "[t]he government cannot return property it does not [yet] possess[.]" *Glover v. United States*, 2008

WL 4533928 at *1 (S.D. Ga. Oct. 8, 2006) (cite omitted). If convicted, defendant may move under Fed. R. Crim. P. 32.2(b)(1)(B) for a hearing to determine whether the contents of the Wells Fargo collateral account are subject to forfeiture. His motion to avoid the forfeiture of his Wells Fargo collateral account should be denied.

## VI.    The Indictment's Timeliness and Sufficiency

The indictment charges defendant with mail fraud in furtherance of his scheme to steal more than $700,000 from the United States by submitting false CDSOA claims for expenditures totaling $24,184,352. *See* doc. 1. In late 2013, defendant's first CDSOA claim was questioned by Customs, and an investigation was launched that ponderously trucked on through spring 2016. Doc. 42 at 4. A year later, a federal grand jury returned an indictment charging that, beginning in July 2010 and continuing through 2014, defendant committed four counts of mail fraud, three counts of making false statements, and two counts of money laundering transactions over $1,000. *See* doc. 1 (indictment dated May 3, 2017). Defendant contends that the Government's delay in bringing charges constitutes an unlawful delay justifying dismissal of the indictment. Doc. 34.

The statute of limitations is the primary safeguard against the government bringing stale criminal charges. *United States v. Marion*, 404 U.S. 307, 322 (1971). Due process may require the dismissal of an otherwise timely indictment, if a defendant establishes substantial prejudice and the delay was the product of a deliberate act by the government to gain a tactical advantage. *United States v. Foxman*, 87 F.3d 1220, 1222 (11th Cir. 1996); *see also United States v. Lovasco*, 431 U.S. 783, 789 (1977) (the Fifth Amendment "Due Process Clause has a limited role to play in protecting against oppressive delay."). A defendant shoulders the burden of "show[ing] that pre-indictment delay was deliberate for the purpose of tactical advantage," *United States v. Thomas*, 62 F.3d 1332, 1339 (11th Cir. 1995), by establishing either that the government acted in "bad faith" by intentionally delaying the prosecution to cause him prejudice or that "the government ma[de] a judgment about how it [could] best proceed with litigation to gain an advantage over the defendant and, as a result of that judgment, [the] indictment [was] delayed." *Foxman*, 87 F.3d at 1223 n. 2. This is an "exceedingly high" burden. *Butler*, 792 F.2d at 1533; *United States v. Jones*, 2006 WL 1653762 at *1 (S.D. Ga. June 7, 2006) (citing *Tiemens v.*

*United States*, 724 F.2d 928, 929 (11th Cir. 1984) and *United States v. Solomon*, 686 F.2d 863, 872 (11th Cir. 1982), and noting that no defendant had yet met this burden in this Circuit, at least in any published decision). Defendant has wholly failed to meet this burden.

Anderson has not demonstrated any prejudice suffered by the Government's investigative delay -- his assertions that the delay prejudiced him, in that at least one witness is deceased and other witnesses' memories dimmed by the passage of time, amounts to mere conjecture. *Butler*, 792 F.2d at 1533 ("Speculative allegations, such as general allegations of loss of witnesses and failure of memories, are insufficient to demonstrate the actual prejudice required. . . ."); *United States v. Johnson*, 802 F.2d 833, 835-36 (5th Cir. 1986) ("diminished recollection alone does not constitute substantial prejudice warranting a finding of a due process violation."); *see also Marion*, 404 U.S. at 326 (when preindictment delay is asserted, actual prejudice and not merely "the real possibility of prejudice inherent in any extended delay" must be demonstrated). And defendant's complaint that he was somehow prejudiced *per se* by the passage of time (*i.e.*, he started submitting CDSOA claims in 2005 and the Government only indicted him in 2017,

over a decade after his first allegedly fraudulent claim was submitted) is dead on arrival. The law in this Circuit is clear that "prejudice will not be presumed because of a lengthy delay." *Stoner v. Graddick*, 751 F.2d 1535, 1544 (11th Cir. 1985).

Moreover, he has not demonstrated that the Government sought to gain any tactical advantage in the case against him by dragging its feet. *Marion*, 404 U.S. at 324-25; *see also United States v. Lovasco*, 431 U.S. 783, 785 (1977) ("investigative delay is fundamentally unlike delay undertaken by the Government solely to gain tactical advantage over the accused."); *United States v. Keel*, 254 F. App'x 759, 760 (11th Cir. 2007) (defendant must show both actual prejudice and *deliberate* delay -- delay for investigative purposes does not qualify). Anderson's reliance on *Foxman*, 87 F.3d 1220, where "most of the evidence was testimonial," is misplaced. As explained by the Government at the hearing, the heft of the evidence is documentary -- both the phony ones Anderson turned in, and the dearth of legitimate receipts substantiating his expenditure claims.

Anderson has simply failed to demonstrate beyond bare accusations that the Government gained any tactical advantage in conducting a

lengthy investigation to turn up, suss through, and marshal its evidence for presentation to a grand jury. *Solomon*, 686 F.2d at 872 (investigative delay associated with a prosecutor's desire to only seek indictment when "he is satisfied that he can prove guilt beyond a reasonable doubt" does not establish second prong of due process analysis); *United States v. Jones*, 592 F. App'x 920, 922 (11th Cir. 2015) (the Government's "simply gaining a tactical advantage is not enough" to meet the tactical advantage prong); *see also United States v. Ramirez*, 491 F. App'x 65, 70 (11th Cir. 2012) (though defendant argues "that the representation of the government that the delay was due to the complexity of the case 'does not truly explain the delay,' [ ] the government does not bear the burden of explaining the reason for the delay"). He has not shown either prejudice or the Government's deliberate delay to warrant dismissal of the indictment.

Anderson also moves, in the alternative, to dismiss counts one through four of the indictment for failing to specify which of his actions violated the statutory section for "mail fraud," which criminalizes a participation in a "scheme to defraud a person of money or property," 18 U.S.C. § 1341. Doc. 35; *see also* doc. 1 at 2 (titling section "Counts

One through Four, Mail Fraud, 18 U.S.C. § 1341" without reference within the body of the text to that section). But all that is required to meet constitutional snuff is that the accused "be informed of the nature and cause of the accusation." U.S. Const. Amend. VI; Fed. R. Crim. P. 7(c)(1); *United States v. Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006).

The Court must review the face of the indictment and the language used to charge the crimes. *Sharpe*, 438 F.3d at 1263. The mail-fraud statute boils down to two elements: "(1) an intentional participation in a scheme to defraud a person of money or property, and (2) the use of the mails in furtherance of the scheme." *Id*. Here, the indictment clearly states that Anderson is charged in counts one through four with violating the mail fraud statute, that he "knowingly and willfully devised and intended to device a scheme and artifice to defraud [Customs], and to obtain money from [Customs] by means of false and fraudulent pretenses, representations and promises," by "creat[ing] and mail[ing] false and fraudulent receipts and other documentation in support of his request for these funds." Doc. 1 at Caption, ¶¶ 9 & 12. The indictment further specified four mailings sent through United States mail "for the purpose of executing, and attempting to execute, [his] scheme and

artifice." *Id.* at ¶ 14. The indictment is sufficient on its face to apprise Anderson "with reasonable certainty[ ] of the nature of the accusation against him." *Sharpe*, 438 F.3d at 1263; *id.* at 1264 ("the allegations in the indictment were sufficient to state the charged offenses as a matter of law as to both counts of the indictment because the counts contained all of the elements of the offenses charged and informed the defendants of the charges they faced."). This motion is meritless.

## VII. CONCLUSION

In sum, defendant's various discovery motions (docs. 21, 30, 31, 32, and 33) are **GRANTED** as unopposed, his motion to dismiss the indictment for preindictment delay (doc. 34) should be **DENIED**, his motion to dismiss counts one through four of the indictment (doc. 35) should be **DENIED**, and his motion for a *Franks* hearing and to suppress other evidence (doc. 29) should be **DENIED**.

This Report and Recommendation (R&R) is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3. Within 14 days of service, any party may file written objections to this R&R with the Court and serve a copy on all parties. The document should be captioned

"Objections to Magistrate Judge's Report and Recommendations." Any request for additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge. The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to timely file objections will result in the waiver of rights on appeal. 11th Cir. R. 3-1; *see Symonett v. V.A. Leasing Corp.*, 648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO REPORTED AND RECOMMENDED,** this __30th__ day of November, 2017.

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA